67357. WRIGHT v. SOUTHERN BELL TELEPHONE & TELEGRAPH COMPANY, INC.

QUILLIAN, Presiding Judge.
This is an appeal from a grant of summary judgment to defendant-appellee Southern Bell (Bell) in an action arising from the temporary disconnection of plaintiff-appellee Mrs. Wright's telephone service.

Mrs. Wright and her 72-year-old husband lived in Pittsburgh, Pennsylvania for many years, where the husband worked in a steel mill until he became disabled and retired, and Mrs. Wright had employment as a working foreman in a home for boys until the condition of her health prevented her from continuing. In 1975 she returned with her husband to Macon where she had many relatives and took up residence there. She took in roomers and had telephone service with Bell. In 1978 her 30-year-old daughter, Christine, also moved to Macon from Pittsburgh with her child and had her own

residence with telephone service. Christine was married to Henderson who was in the Army and stationed in various locations to which she did not accompany him. Christine's telephone service was in her husband's name although he was infrequently at home. In 1979 Christine separated from her husband and in July moved in with her mother, Mrs. Wright. The telephone service in Christine's husband's name was eventually disconnected with charges of $157 still owing. In the fall of 1980 Christine left her mother's and moved to a residence with a telephone of her own but continued to receive mail at her mother's. The $157 owing to Bell was not paid and was referred to a collection agency who contacted Christine about the unpaid bill in the fall of 1981. Christine disputed her liability for the bill claiming that the unpaid charges had been incurred by her husband. Ross, a Bell employee in charge of collecting delinquent accounts, was informed of the situation by the collection agency and, erroneously, that Christine was residing with her mother. Ross compared the long distance calls on the delinquent bill with long distance calls on Mrs. Wright's telephone service and found similarities in locations to which calls were placed. Because of the similarities in the calls and his information that Christine was living with her mother and had not paid the delinquent bill, he concluded that Christine was making the long distance calls and that a potential for loss existed again. On November 2, 1981, Ross called Christine at her mother's number and told her that she was responsible for the delinquent bill. He stated that she was required to pay it unless she could provide Bell with a separation agreement relieving her from responsibility for the bill, and that if she did not do either of these things, a deposit would be required on Mrs. Wright's telephone service because there was an increased risk to Bell. Christine took no action and by letter dated November 17, 1981 Ross sent a letter to Christine at Mrs. Wright's address which repeated substantially the same things he had told her on the telephone. Christine took no action within the time limit set by Ross and on December 3, 1981, Ross sent Mrs. Wright a letter informing her that Christine was responsible on the delinquent bill and, because she resided with Mrs. Wright, "an element of risk is now associated with your service." The letter went on to state that unless the unpaid bill was paid by Christine or separation papers showing she was not responsible for the bill were presented to Bell, a security deposit of $120 would be required on Mrs. Wright's telephone service; and if no action was taken by December 11, that Mrs. Wright's telephone service would be temporarily denied. At that time Mrs. Wright's telephone bill payment was current and Ross considered Mrs. Wright to have a good credit rating. Neither Mrs. Wright nor Christine took any action and Mrs. Wright's service was temporarily

disconnected on December 14. The service was resumed on December 15 after the intervention of Mrs. Wright's attorney. This action followed alleging in count 1 intentional termination of her telephone service and infliction of emotional distress in order to make Mrs. Wright pay a debt she was not responsible for; and in count 2 for defamation by a Bell recording informing callers on her disconnected service that her telephone was temporarily disconnected, damaging her reputation by inferring that she had not paid her telephone bill. Prior to the hearing on the motion for summary judgment Bell amended its answer to show that it had credited Mrs. Wright's account with an amount representing the proportionate charge to her for the period her service was interrupted. *Held:*

1. Bell's support for its motion for summary judgment rested principally on Ross' deposition testimony which was substantially the same as the foregoing recitation of his actions. Bell contends that it was authorized by the General Subscriber Service Tariff issued by the Public Service Commission (PSC) to require the security deposit "in order to safeguard its interest" and that it was also authorized thereby to suspend services for failure to make a suitable deposit.

Mrs. Wright's evidence was in conflict with Ross'. In her answers to Bell's interrogatories she stated: "Ross called me on several occasions and demanded that I either pay my son-in-law's phone bill, pay a $120 deposit or kick my daughter out of the house." In her deposition she testified that she had several telephone conversations with Ross. "He said that I would pay the bills (of the son-in-law). I said . . . I have never been late with my bills . . . I'm not responsible for my son-in-law or my daughter's debts, and he said, you are responsible and you will pay it, and I will turn that phone off if you don't . . . [H]e said . . . you will pay them (the bills of the Hendersons') or you will kick your daughter out of the house . . . He never asked me did my daughter live there (with her). He just told me I would pay the bill or they would turn the phone off and kick the daughter out of the house. He said, I'm going to make sure that you don't have access to a telephone . . . The next time . . . Ross called me, . . . I said, I talked to a lawyer . . . and the lawyer told me that you couldn't turn my phone off for what someone else owes. He told me he didn't care what the lawyer said, that he was going to turn that telephone off . . . he said, I don't care how upset you get, you are going to pay that telephone bill. You are going to pay it or either we're going to turn you off."

There is no question that under the PSC tariff Bell can require a security deposit of a subscriber if it is necessary to insure payment of its charges incurred by that subscriber, and that service can be suspended if the deposit is not paid. But can such an authority be

used to require a subscriber, who has no history of delinquency in paying her bills, to pay an additional security deposit in order to compel the payment of a telephone bill which was not charged to the telephone of the subscriber and which the subscriber had no other responsibility to pay? We believe not.

" 'A public-service corporation can not safely be invested with a power and authority which will allow it to become both judge and jury in the determination of a disputed claim due it from a consumer. To do so would be dangerous and investing it with a power that invites extortion, and is too liable to be abused . . . Such companies receive a public franchise for the purpose of serving the people for reasonable compensation, but they have no right to use the privileges granted for the purpose of oppression, discrimination, or harassing or annoying the . . . consumer,' [Cit.]" *Elwell v. Atlanta Gas-Light Co.,* 51 Ga. App. 919 (2), 923 (181 SE 599).

We have considered analogous circumstances.

In *Elwell v. Atlanta Gas-Light Co.,* the plaintiff owed a past due indebtedness on his gas bill at a prior residence. At a new residence gas service was initiated with a minimal deposit but then cut off until a substantially higher deposit was made, allegedly to compel payment of the past due account. Reversing the trial court's dismissal of the complaint in tort on demurrer, we said:

"If the defendant wishes to collect the old bill, it should resort to the usual judicial process in like manner as other creditors are required to do, and not coerce the plaintiff into paying the old bill by denying him gas.

"The defendant contends that it had a right to demand the additional deposit of $25, which it states was reasonable, and that it had a right to shut off the supply of gas upon the failure of plaintiff to comply with its demand. We are of the opinion that if this increase in deposit of $25 was bona fide requested in accordance with a reasonable rule and regulation to exact payment in advance, or as security in advance in a reasonable amount for the future consumption of gas under the present contract, the defendant would not be violating its duty, and the exercise of this authorized right, whether done maliciously or not, would not make the defendant liable. On the other hand, if the additional deposit of $25 was required, not in accordance with a reasonable rule and regulation, but arbitrarily in order to coerce the [plaintiff] into paying the old bill arising under a separate contract at a former residence, — that is, if the defendant when [it] received the $25 additional advance deposit was intending to credit it on the old account against the wishes of the plaintiff, the defendant would be violating its duty to the plaintiff." *Id.* at 924.

And in *Southern Bell Tel. &c. Co. v. Invenchek,* 130 Ga. App. 798 (2), 800 (204 SE2d 457), we said: "Count 3 alleges that the interruptions of telephone service, delays, and disconnections of plaintiff's telephone were the result of wilful misconduct on the part of the defendant. Here the tariff quoted above [limiting liability for such acts] has no application, and constitutes no defense as against this count . . ."

Thus we conclude that Mrs. Wright has stated a cause of action against Bell for improper termination of her telephone service, and that use of the PSC tariff authorization to impose a security deposit and the termination of service upon nonpayment of the deposit is no defense to the action if it was used to coerce the payment of a debt not owed by Mrs. Wright. The evidence being clearly in conflict as to whether Bell used the demand for the security deposit and subsequent termination of service in a coercive manner, the trial court erred in granting summary judgment on the first count. OCGA § 9-11-56 (c) (Code Ann. § 81A-156).

Bell belatedly asserts that even if it had no right to terminate Mrs. Wright's telephone service the evidence shows that the termination was not willful, therefore limiting its damages to those allowed by the PSC tariff; and since those damages have already been credited to Mrs. Wright's account, grant of summary judgment in its favor is mandated.

As indicated in *Southern Bell Tel. &c. Co. v. Invenchek,* 130 Ga. App. 798 (2), supra, if the interruption of service was the result of willful misconduct on Bell's part, the tariff limitation on liability has no application. Willful, of course, means intentional or deliberate.

As can be seen from the recitations of Ross' and Mrs. Wright's versions of what transpired as set out above, the evidence is also clearly in conflict as to whether Ross' conduct in causing the termination of service was willful, deliberate or intentional in order to compel Mrs. Wright to pay another's bill; or was the mere negligent application of the tariff authorizing a deposit by Ross in the mistaken belief he was doing what the tariff authorized to be done. This conflict in evidence also prevents the grant of summary judgment.

2. As to the defamation count, Bell presents no evidence to contradict Mrs. Wright's allegations and evidence that its recording informing callers to Mrs. Wright's suspended telephone service that the service was "temporarily disconnected," was defamatory. Instead it is argued that the words were not defamatory; that if they were, the defense of truth applied as Mrs. Wright had not paid the deposit; that the recording's words were a statement of commercial necessity which cannot be considered slanderous; and that the recording was

privileged under OCGA § 51-5-7 (2) (Code Ann. § 105-704) as a statement made in good faith in the performance of a legal or moral private duty.

"Defamatory words which are actionable per se are those which are recognized as injurious on their face — without the aid of extrinsic proof. However, if the defamatory character of the words do not appear on their face but only become defamatory by the aid of extrinsic facts, they are not defamatory per se, but per quod, and are said to require innuendo. [Cit.] 'The office of an innuendo is to explain that which is of doubtful or ambiguous meaning in the language of the publication, but cannot enlarge the meaning of words plainly expressed therein.' [Cit.] Where the words used are capable of having two or more different meanings, they are ambiguous and the plaintiff may allege the meaning with which he claims they were published, and it is for the jury to determine whether they were so published. [Cit.] The testimony of [hearers] of the alleged defamatory language as to what they understood the words to mean may be admitted where the meaning is doubtful or ambiguous. [Cits.]" *Macon Tel. Pub. Co. v. Elliott,* 165 Ga. App. 719 (5), 723 (302 SE2d 692).

The language of the recording in the instant case was not defamatory per se. As we cannot say that the alleged language was not defamatory as a matter of law a cause of action is stated and the language means what the average hearer construes it to mean. Bell having presented no evidence that the language did not carry the innuendo alleged that Mrs. Wright did not pay her telephone bill, it did not carry its burden on this issue under OCGA § 9-11-56 (c) (Code Ann. § 81A-156).

The remaining arguments concern issues of fact which depend on a fact finder's determination of the first count.

Bell having failed to carry its burden on this count, the trial court also erred in granting summary judgment thereon.

*Judgment reversed. Sognier and Pope, JJ., concur.*

DECIDED JANUARY 5, 1984.

*Lonzy F. Edwards,* for appellant.
*H. Jerome Strickland, Charles L. Ruffin,* for appellee.